IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Kanawha Insurance Company, ) | |
| ) | C/A No. 0:03-2765-MBS |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **OPINION AND ORDER** |
| Employers Reinsurance Corporation, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Plaintiff Kanawha Insurance Company (Kanawha) brought this action against Defendant Employers Reinsurance Corporation (ERC), alleging causes of action for (1) breach of contract, (2) constructive fraud, (3) breach of contract accompanied by a fraudulent act, and (4) mutual mistake, unjust enrichment, and rescission. See Second Amended Complaint filed August 16, 2004. The matter is before the court on motion for partial summary judgment filed by Kanawha on February 22, 2005, as well as motion for summary judgment filed by ERC on February 22, 2005. The court held a hearing on July 8, 2005. The court has considered the pleadings, motions, exhibits, deposition testimony, and other evidence of record in this case. The court concludes that ERC's motion should be granted and Kanawha's motion denied.

FACTS

Kanawha is in the business of providing life, accident, and health insurance. In 1994 it introduced a new long-term care (LTC) insurance product.[1] See S.C. Code Regs. § 69-7.VII.J (defining "long-term care insurance"). Kanawha's LTC coverage is sold at a level premium, which

---

[1] In South Carolina, insurers must offer LTC policies on a "guaranteed renewable" basis. "Guaranteed renewable" means that the insured has the right to maintain in force the LTC policy by the timely payment of premiums, and, as long as the policy is in force, the insurer cannot decline to renew it. See S.C. Code Ann. Regs. § 69-44.3.A.(s).

means that the cost to the policyholder is calculated to remain unchanged throughout either the lifetime of the policy or for some shorter projected period of years. See S.C. Code Reg. § 69-7.VII.I (defining "level premium"). When a policyholder is young, the likelihood of his claiming benefits under a LTC policy is low; thus the premiums charged are over-sufficient to cover expected current claims. However, the likelihood of an insured's making a claim against the LTC policy increases as the policyholder ages, and eventually the insurer may be required to pay more on claims than is received through the premiums. For this reason, insurers that sell LTC policies funded by level premiums are required to establish an "active life reserve" (ALR) or "contract reserve" by which premium over-sufficiencies in the early years of the policy are invested to fund the under-sufficiencies of the premium expected by the time the policyholder is in a position require long-term care. See id. § 69-7.IV.A.1.a ("[c]ontract reserves are required . . . for . . . all individual and group contracts with which level premiums are used"). "The building of a prospective contract reserve is a natural result of level premiums." Id. § 69-7.VII.I.2. Because it sells LTC policies at level premiums, Kanawha falls within the group of insurers obligated to maintain ALR to cover the anticipated cost of care as the risk of claims under the LTC policies increases.

On or about March 28, 1995, Kanawha contracted with ERC and Cologne Life Reinsurance Company (Cologne) for the purpose of obtaining reinsurance.[2] Kanawha and ERC entered into two

---

[2] "Reinsurance" means "'the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss. The true reinsurer is merely an insurance company or underwriter which deals only with other insurance companies as its policyholders.'" Carolina Nat'l Ins. Co. v. S.C. Tax Comm'n, 182 S.E.2d 878, 880 (S.C. 1971) (quoting 13 John Alan Appleman, Insurance Law and Practice, § 7681).

agreements: (1) a Quota Share Treaty by which ERC reinsured 7.5% of all claims arising from an insured's confinement in a nursing home (Cologne reinsuring another 7.5%); and (2) an Excess Treaty by which ERC reinsured an additional 42.5% of any confinements in excess of two years' duration (Cologne reinsuring the remaining 42.5%). Stated differently, Kanawha limited its exposure during the first two years of a policyholder's confinement by shifting 15% of the risk to ERC and Cologne; for persons who were confined in excess of two years, Kanawha shifted 100% of the risk to ERC and Cologne.

The Quota Share Treaty provided that ERC would establish its quota share of Kanawha's ALR applicable to the policies reinsured by ERC. See Quota Share Long Term Care Reinsurance Agreement, Art. IX. The termination provision of the Quota Share Treaty provided that either party upon notice could terminate with respect to new business and allow the ALR to expire as the corresponding in-force policies expired, or that Kanawha could cancel or recapture the in-force business and ERC would pay Kanawha the corresponding ALR. Id., Art. XV. However, the Excess Treaty specifically provided that ERC was not obligated to establish any ALR with respect to the policies it reinsured under the Excess Treaty. Excess Long Term Care Reinsurance Agreement, Art. IX. The Excess Treaty further provided that either party could terminate upon notice and that ERC would return to Kanawha unearned reinsurance premiums. Id., Art. XV. Thus, unlike the Quota Share Treaty, the termination provision of the Excess Treaty contained no requirement regarding disposition of ALR. This is because the express terms of the Excess Treaty excused ERC from any obligation to establish ALR for policies it reinsured under the Excess Treaty.

The parties do not dispute that the Treaties were negotiated at arm's length and reviewed by counsel prior to execution. Kanawha candidly admits that its chief actuary "signed the Excess treaty

3

without paying much attention to Article IX because he believed the ERC would agree to make the Excess treaty guaranteed renewable." Plaintiff Kanawha Insurance Company's Motion for Partial Summary Judgment, p. 8. Kanawha believed that a guaranteed renewable Excess Treaty would nullify the ALR disclaimer. Id.

Approximately eighteen months after the Excess Treaty was executed, Kanawha approached ERC about the possibility of ERC's establishing ALR under the Excess Treaty. ERC declined to do so. Kanawha also wrote a letter to ERC in October 1996 regarding its interest in having the Treaties mirror each other with respect to the ALR, but no action was taken by ERC. Nevertheless, Kanawha continued to operate under the Treaties as written until late 1999 or early 2000, when Kanawha became concerned that its ALR would be inadequate. Kanawha again raised an issue to ERC seeking a change in the Excess Treaty to void the ALR disclaimer. ERC again declined to revisit the issue.

ERC terminated the Excess Treaty in October 2000. Kanawha demanded ERC transfer ALR to Kanawha along with unearned reinsurance premiums due under Article XV of the Excess Treaty. ERC had established no ALR, as permitted under Article IX of the Excess Agreement, and therefore refused to disgorge additional monies to Kanawha beyond unearned reinsurance premiums. According to Kanawha, ERC reaped $2 million in profits in what should have been ALR created by the premiums paid by Kanawha to ERC.

## DISCUSSION

Kanawha and ERC each has moved for summary judgment pursuant to Rule 56, FRCP. Summary judgment "shall be rendered forthwith when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), FRCP. For the evidence to present a genuine issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The moving party has the burden of proving that there are no facts from which it would be open to a jury to make inferences favorable to the non-movant. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), FRCP. The opposing party may not rest on the mere assertions contained in the pleadings. Id. The court must view the record as a whole and in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus. Inc., 763 F.2d 604 (4th Cir. 1985).

### Law/Analysis

There is no dispute that the parties freely entered into the Excess Treaty and that both parties were fully aware of the express provision excusing ERC from any obligation to establish any ALR applicable to the LTC policies covered under the Excess Treaty. As a general rule, "[t]he Court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." Jordan v. Security Group, Inc., 428 S.E.2d 705, 707 (S.C. 1993). However, South Carolina long has recognized that "the Courts of this State will not lend aid to the enforcement of contracts that are in violation of law or opposed to sound public policy." Grant v. Butt, 17 S.E.2d 689, 693 (S.C. 1941). The dispositive issue is whether an insurer and reinsurer can contractually agree as to which party will be obligated to maintain the ALR for LTC policies funded under level premiums. If public policy or the law mandates that a reinsurer of such an LTC policy also establishes the ALR, the ALR disclaimer in the

Excess Treaty would be unenforceable. If, on the other hand, public policy or the law does not prohibit a direct insurer and reinsurer from negotiating which party will be responsible for establishing ALR, the court is obligated to enforce the terms of the Excess Treaty.

There are two principal ways in which risk is assumed by the reinsurer, both of which are reflected in the separate agreements executed by Kanawha and ERC. "Quota share" reinsurance assumes the risk on a proportional basis. "The distinguishing characteristic of this approach is that the ceding insurer and the reinsurer share premiums and losses in proportions fixed by the contract. Under this approach, all premium, losses, and expenses are allocated between the insurer and the reinsurer on a prorated pre-arranged basis . . . ." 14 Eric Mills Holmes & L. Anthony Sutin, Holmes' Appleman on Insurance 2d (hereinafter "Holmes on Insurance") § 102.3 (2000). Under a quota share arrangement, "[b]oth the good risks and the bad must be ceded and assumed, tending to create an identity of interest between the ceding insurer and the reinsurer." Id.

"Excess reinsurance" contracts "provide that the reinsurer will reimburse the ceding insurer for all losses that exceed a prearranged **retention** amount, specified in the reinsurance contract in exchange for a fixed premium." Id. § 102.3. Once the retention is exhausted, the reinsurer pays any additional losses. Id. Thus,

> the distinguishing characteristic of [excess reinsurance] is that the ceding insurer and the reinsurer share premiums and losses in definite amounts fixed by the contract. These amounts are not proportional between the ceding insurer and the reinsurer, and the non-proportional character of this form of reinsurance permits the ceding insurer to protect itself against severe individual losses or disastrous overall underwriting results or against an accumulation of losses arising from one catastrophic event or occurrence.

Id.

Whether quota share reinsurance or excess reinsurance, reinsurance "is a contract by which one insurance company agrees to indemnify another in whole or in part against loss or liability which the latter has incurred under a separate contract as insurer of a third party." Id. § 105.4. In an indemnity reinsurance transaction, the reinsurer does not become directly liable to the policyholders; rather, the reinsurer simply agrees to indemnify the ceding company for a specified portion of the amounts that become payable under the reinsured policies. Oxford Life Ins. Co. v. United States, 790 F.2d 1370, 1376 n.6 (9th Cir. 1986). It follows that a reinsurer contractually obligated to indemnify the reinsured for losses paid must possess adequate assets to do so as a condition precedent to entering into the agreement; in point of fact, an accredited reinsurer in South Carolina must maintain a surplus as regards policyholders in an amount not less than $20,000,000. See S.C. Code Regs. 69-53 (pertaining to credit for reinsurance). The underlying purpose of building a prospective contract reserve is to ensure payment of claims at the point the level premiums are undersufficient. No such concern appertains to a reinsurer that has the requisite surplus reserves already in place and is subject to solvency regulations by the Department of Insurance. Cf. Holmes on Insurance, § 103.1. In the court's view, an agreement permitting a reinsurer to decline to fund ALR does not offend public policy.

Kanawha asserts, however, that S.C. Code Regs. § 69-7.V "makes the ALR obligation applicable to reinsurers who receive level premiums[.]" Plaintiff Kanawha Insurance Company's Motion for Partial Summary Judgment, p. 7. The court disagrees.

Section 69-7.V provides:

Increases to, or credits against reserves carried, arising because of reinsurance assumed or reinsurance ceded, must be determined in a manner consistent with these

minimum reserve standards and with all applicable provisions of the reinsurance contracts which affect the insurer's liabilities.

Section 69-7 sets forth minimum standards for three categories of accident and health insurance reserves: claim reserves (Section II), premium reserves (Section III), and contract reserves (Section IV). S.C. Code Ann. Regs. 69-7I.B.1. An insurance copy can enhance its available surplus by reinsuring some of the risk it has assumed through the ceding of insurance policies. Holmes on Insurance § 103.1. The insurer then on its annual statement can take credit as an asset for reinsurance recoverables, and as a reduction of its unearned premium and loss reserves on account of reinsurance ceded. Id. The amount of credit is set by regulation in each state. Id. In the court's view, section V cautions the ceding insurer that with respect to calculating credit for reinsurance on a financial statement, see S.C. Code Regs. 69-53, minimum reserve standards must be protected. The court discerns nothing in Regulation 69-7 that would restrict a ERC and Kanawha from negotiating responsibility for the ALR obligation arising from LTC policies sold at a level premium. Accordingly, the court concludes that Article IX of the Excess Treaty is not violative of South Carolina law or public policy and therefore enforceable.

Kanawha's first and third causes of action are for breach of contract and breach of contract accompanied by a fraudulent act. A breach of contract occurs when a party without legal excuse fails to perform any promise that forms a whole or a part of a contract. 17A Am. Jur. 2d Contracts § 716. The essential elements of a claim for breach of contract accompanied by fraudulent act are: (1) a breach of contract; (2) fraudulent intent in connection with the breach of contract; and, (3) a fraudulent act accompanying the breach. Smith v. Canal Ins. Co., 269 S.E.2d 348, 350 (1980). Kanawha's first and third claims for relief are premised on Kanawha's assertion that ERC was

obligated under the Excess Treaty to maintain ALR and return the sums representing ALR to Kanawha at the termination of the agreement. There being no such obligation, there was no breach on the part of ERC. ERC's motion for summary judgment is granted as to these issues.

With respect to Kanawha's second claim for relief, the court notes that to establish constructive fraud, all elements of actual fraud except the element of intent must be established. O'Quinn v. Beach Assoc., 249 S.E.2d 734, 738 (S.C. 1978). To establish the remaining elements of fraud, Kanawha must show (1) a representation; (2) its falsity; (3); its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) the hearer's ignorance of its falsity; (6) the hearer's reliance on its truth; (7) the hearer's right to rely thereon; and (8) the hearer's consequent and proximate injury. King v. Oxford, 318 S.E.2d 125, 127 (S.C. Ct. App. 1984).

There is no foundation in the record to support a finding of constructive fraud. Kanawha was aware of the ALR disclaimer in the Excess Treaty. Kanawha nevertheless entered into the agreement in hopes that ERC at some point would agree to modify the Excess Treaty to mirror the terms of the Quota Share Treaty with respect to funding the ALR reserve. ERC made no representation that it would be amenable to changing the terms of the Excess Treaty; to the contrary, ERC informed Kanawha that it was not interested in renegotiating the ALR provision. Kanawha cannot show that ERC made a promise of future action with no intention of fulfilling the promise at the time it was made. See Schie v. Gay & Taylor, Inc., 347 S.E.2d 910 (S.C. Ct. App. 1986). ERC's motion for summary judgment is granted as to this issue.

With respect to Kanawha's fourth claim for relief, Kanawha seeks to invalidate the Excess Treaty on the grounds of mutual mistake. A contract may be reformed on the ground of mistake when the mistake is mutual and consists in the omission or insertion of some material element

affecting the subject matter or the terms and stipulations of the contract, inconsistent with those of the parol agreement which necessarily preceded it. Commercial Union Assurance Co. v. Castile, 320 S.E.2d 488, 490 (S.C. Ct. App. 1984). A mistake is mutual where both parties intended a certain thing and by mistake in the drafting did not obtain what was intended. Sims v. Tyler, 281 S.E.2d 229, 230 (1981). Mutual mistake must be shown by clear and convincing evidence. Id.

In this case, both ERC and Kanawha executed the Excess Treaty fully aware of its terms and with the knowledge that Article IX did not impose any obligation on ERC to establish ALR. Kanawha discussed the ALR provision with ERC in an effort to convince ERC to modify the Excess Treaty, a modification ERC was not willing to make. Kanawha's attempts at revisiting the issue and ERC's refusal to renegotiate belie any finding that the parties intended a different contract than what was drafted. ERC's motion for summary judgment is granted as to this issue.

### III.  CONCLUSION

For the reasons stated, ERC's motion for summary judgment is granted. Kanawha's motion for partial summary judgment is denied. ERC's motion to strike is denied as moot.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
United States District Judge

Columbia, South Carolina

September 28, 2005.